And will the lawyers just step up and identify yourselves for the record? Good morning, Your Honor. My name is David Hall. I'm here on behalf of the defendants of the appellate. Good morning, Your Honor. My name is Michael Rasek. I'm here on behalf of the plaintiffs' appellate. Great. Now, let me just say this. You both have, I'm not going to limit your time. It's a lot of issues in this case. So if we get tired of hearing you, I may stop. But otherwise, I'm not really going to limit you. There was an issue raised, and so I wanted to say this because I wanted to ask a couple of questions beforehand, because I don't want to interrupt you a lot either. One is with the jury instructions. I know that there was an instruction or two instructions that were withdrawn. And there was an argument that they adequately or correctly stated the law. And there was an argument that says that they were approved by the Supreme Court. I know that's not right because I chaired the committee for six years. So I know none of the instructions are pre-approved by the Supreme Court. So if you agree with that, fine. If you don't, you can certainly tell me. So given that I have a question or several questions, I want both of you to answer from your point of view. And the first one is, given that the instructions that were utilized in this case were not pre-approved by the Supreme Court, what was wrong with or right with the instruction that was given by the plaintiff in this case that was tendered? All right. And this is for the plaintiff. I should say the appellee. How do the cases cited in the committee comments support the giving of those new instructions? If you've read them, if you haven't, I'm going to look this up. I've read some of them myself, Douglas and Leonardi. How do they support the giving of the instruction without the sole proximate cause language? And, of course, with the other side, why, they do. The next question is, what is wrong with the defense tender modified 1501, which includes the sole proximate cause language? And in that regard, I know that there's a contrast in the briefs as to what was said. I want to know what the defendant argued to the trial judge in support of giving their modified instruction, as opposed to, and what they argued against, if anything, in giving the plaintiff's argument. Let's see. I'm saying these things because it's a really interesting case, and certainly we haven't reached any decisions on it. And I'm still going to have to search the record, because I don't take anybody's word for anything, okay? But I had a couple more questions. Was there a written high-low offer in this case? And the other was, one side is saying there's a judicial admission or admissions, one side is saying there are not. If there, whichever side you have, in terms of what was said, I want the exact statement in context of what was said. I hope I don't have to ask any more questions, but I think those are the ones that are certainly, to me, more relevant. Because if the instruction is wrong, and the jury instructions don't fairly and accurately state the law, you're doing this again. Okay. All right. Thank you. And the appellant can begin whenever they are ready. Can I ask a question? I see so many people. Are there young, are there law students in here? Yeah, there's some law students here. Oh, okay. Hello. How are you guys? You're sitting so far back. Can you hear back there? Because you can come in the front row if you want. Okay. All right. I assume there were law students, since I saw so many young faces. Counsel, I'm sorry. Mr. Hoffman, you can begin. All right. Well, first of all, good morning to everyone. I have to admit, I'm kind of a stranger in a strange land. I live over in the Daly Center for over 40 years trying cases. This is unfamiliar territory for me, but I'm going to do my best to abide by your customs the way cases are argued here. But if I muddle my way through, please give me some patience. So, yes, I was the lead trial lawyer with my team on this case, which is why I'm here. Our excellent briefs were prepared by my senior colleague, Mr. Griffin, who you probably all know, so I'm the unfamiliar one. But because this was my trial and I was the one in the trenches, so to speak, and because myself, my firm, and all my colleagues will be affected by this decision for decades to come, we thought it was appropriate to have the trial lawyer doing this argument, and I hope he didn't make a mistake there. So what's this about? Why are we here? And I'm going to try to be mindful of the time, Your Honor. And let me just interrupt you for one second. I probably should have said this. We've read the briefs. We are familiar with the facts. We know some doctors said this, some doctors said this. So you don't have to go through that. No, I don't intend to go through the facts in any detail at all. We trust that everyone has read this thoroughly. But this, globally, you know, it's a medical malpractice case. That's important. A large exposure case, hard fought for three weeks. But, again, I need to talk for a couple sentences why proximate cause is such an important topic in this case and why it is so far reaching. This is a labor and delivery case. And they sued the hospital, the residents, nurses, and a co-defendant obstetrician. The case really, even though it was three weeks of testimony, it came down to a couple basic issues. Should a C-section have been performed approximately 30 or 60 minutes earlier, under the standard of care, number one? And number two, if that had happened, is it reasonable to believe that this youngster would not have had his permanent disabilities? That's what the case is just about. And so, as I defended it, I defended it vigorously. I discussed it comprehensively in my closing. I don't know if any of you read my closing. You probably think I'm long-winded. It was an hour-and-a-half long without notes. And esteemed counsel on the other side of Mr. Rassick, we're good friends. We've known each other for decades. We even tried a case against each other in his prior life. But I'm confused. Sometimes I get confused in my old age. I read the response to our appellate brief, and the very first argument, the very first argument of the plaintiffs are, well, Mr. Hall somehow admitted liability. I've done this 40 years, well over 100 trials. I didn't admit a liability. And it's really, so it's confusing. It's disappointing for me to hear that. Because I can show the court now, we alluded to it in the briefs, for an hour-and-a-half, I tried to explain to this jury why we did not deviate from the standard of care, why this injury would have happened irrespective of our care and treatment. And I say it on and on and on, and I'm closing my whole statement by saying, there's no way, and the young boy's name is A.J., so we refer him to A.J. I said, there's no way A.J. doesn't have these disabilities irrespective of the care, because it all happened in the preceding seven weeks of development. And I said, therefore, we're asking for verdict form B, which is a verdict of no liability, no damages. How am I admitting liability when I'm asking for verdict form B? And he said, somehow I'm trying to almost like bamboozle the jury by saying, A, I recognize the weakness in my case. I'm just going to try to keep the damages down. I just don't understand that. I cited the experts in my case, including Dr. Siccio and Nurse Taylor, who said that the residents and the nurses all complied with the standard of care, that the C-section was timely performed. So I had ample testimony saying standard of care was complied with. And then a majority of my closing gets into this complicated causation issue. And I'm not going to repeat all the details, of course, because you've reviewed it. But I went on and on and on to try to explain to the jury what they had heard over the last three weeks, that because A.J. did not develop properly in the last seven weeks of gestation, and you all know it's 40 weeks of gestation, the last critically important seven weeks, he had a dramatic falling off of the developmental cliff. That was an agreed upon fact in my trial. I cross-examined all the experts, and I had my, the jury required eight doctors talking about this, agreed upon that A.J., and I hope it's permissible to call him A.J. I'm not trying to be disrespectful. It's a fact, not an opinion. For the first 20 weeks, A.J. developed properly. We agree with it, clients agree with it. And we have all these World Health Organization and HADOC and all these different types of metrics that OBs and MFMs use to see is a fetus developing properly. And they look at things like abdominal circumference, head circumference, femur length, weight, et cetera. Halfway through the developmental process, A.J. was right where he was supposed to be. And depending on the scale, in the 30th percentile, the 40th or 50th, depending on which scales we use. Then what happens? They do additional ultrasounds at 33 weeks. Now we're getting about three-fourths through the development. He's still well within normal. He's starting to trail off just a little, but he's still within normal limits on all scales. Then they did an ultrasound shortly before the laboring delivery. And what does it tell us? Fact, not spit, not opinion. Everybody agreed. A.J., for some mysterious reason, went off the developmental cliff at a very time when you have significant brain development. The very areas in the frontal lobe and whatnot, they have development in that last seven weeks. And he went from using different metrics, 30, 40, 50, 60th percentile for different things, to below the third percentile or perhaps below the first percentile, irrespective of which scale we use. There's race-neutral ones with WHO. There are race-specific. But even the race-specific for African American, which A.J. is, he went from weight from about the 60th percentile to the first, 60th to the first in the last seven weeks. I had expert after expert after expert advising this jury. This is severe FGR, fetal growth restriction. They used to call it IUGR, intrauterine growth restriction. Contemporary is fetal growth restriction. All it means in lay terms is the baby didn't develop as he should have. And what made this so telling and so dramatic is that he was halfway through destined to be well within the average, well within the normal. Their own expert, Dr. Popik, she acknowledged that she plotted this all out, and that if everything had gone consistently with the first 20 week trips, he should have been born at about nine pounds. That's a plaintiff's expert. Five pounds, four ounces was A.J.'s birth weight. He went off this cliff. That is a fact, and all the plaintiff's experts agreed with me during cross-examination that that was severe FGR. They all agreed. They all agreed that severe FGR is associated with a variety of problems in the medical literature. And this is a plaintiff's expert's agreement. And then my experts all said this at great length, all to a reasonable degree of medical certainty. And they agreed that the type of permanent problems A.J. has, and this is the key distinction in the case, what was temporary and what was permanent? This was three weeks of fighting. The permanent was A.J. had a lower IQ, some cognitive delay, some learning disabilities, some speech problems, and some ADHD. We agreed those were the problems this young man has, and has had since birth. He does not have CP, according to virtually all the witnesses. So that's what makes this so unusual. The young man has this type of problems that plaintiff's experts acknowledge severe fetal growth restriction can account for. The very problems he has, plaintiff's experts say, can be explained by FGR. My experts all say not only can it be explained, that is the proximate cause in this case. So on the issue of proximate cause, where it gets, I think, confusing for many of us, plaintiff's case obviously focused on they had to establish, well, why would it make a difference if the C-section happened 30 or 60 minutes? They're saying the standard of care required. How would that make a difference? They said, well, they believe there was hypoxia, lack of oxygen. They look at blood gases, heptars, and they talk about something, your honors, it's called HIE, hypoxic ischemic encephalopathy. That may or may not be familiar to you. Hypoxic, low oxygen, ischemic, low blood flow or perfusion. But the key word is encephalopathy. Encephalopathy, encepha, it's either Latin or Greek, brain, apathy, dysfunction. So encephalopathy, if a baby is not born totally, quote, normal, pinkish, good movement, good tone, breathing well, if they're not born that way, and this baby wasn't, they're born depressed, and this baby had something called neonatal encephalopathy. HIE is the old-fashioned term for neonatal encephalopathy. So this baby has been diagnosed with both in the records. The old-fashioned term, HIE, but the pediatric neurologist, the only one who treated this youngster in the first few weeks of life, had a diagnosis of neonatal encephalopathy and IUGR, which is the synonym for FGR. This is the treater. But this is the key, and this is what we tried to establish with the jury, and it goes right to the approximate cause-defense. We agreed the baby had neonatal encephalopathy. I said in my closing, my experts acknowledged it. We agreed you could call it HIE, that's okay. Plaintiff's experts said it's often a transient or temporary phenomenon. This is plaintiff's experts. My experts agreed. My experts said it's usually transient, which means they're depressed, you give them oxygen, you watch them, maybe give them fluids, sometimes meds. The vast majority go on not to have any permanent injury. The jury heard all this. So the plaintiff's theory is that somehow the alleged hypoxia around birth, which there may have been some, that that somehow caused brain injury, and then they wanted the jury then to disregard the fact that this poor baby went off the developmental cliff in the last seven weeks. Black and white fact, black and white fact that the exact, not some, the exact presentation of injury is associated with that phenomenon. So in this case, on standard of care, we vigorously defended it, but again, I've done a few trials. I had some issues. I had my co-defendant, Dr. Johnson, when she was called and said, they asked her, please come in. She said fine. She did not order an emergency C-section. She admits it. She ordered a regular C-section. We thought she'd come in in a half hour. She came in in an hour. These are just the facts. So Dr. Johnson, when she comes in, she looks at the tracings and she's unhappy with them. This all came up in the trial. So Dr. Johnson felt that she should have been called earlier. The jury heard all this. My experts are looking at the fetal heart rate tracings. There was no need for her to be called earlier. There was no need ever to call the emergency C-section until after the patient was already in the OR. And, again, we had some pretty high-powered experts who actually draft the ACOG guidelines on this point. That was Dr. Ciccio. They actually draft the guidelines. And this never needed to be called as an emergency C-section, but I had Dr. Johnson saying she was displeased with either the nurse or the resident. So I knew I could defend this case on standard of care, but our focus was on causation. I think for obvious reasons. So where does that get us with you folks? At the end of the case, we do our jury instruction conference, and I think Judge Brosnahan was placed in a very difficult situation. I do. I don't agree with her ruling, but I sympathize and empathize with her position. These rules had just changed. I mean, within months. So this was a new revision to the core causation type instructions that we've been utilizing, as you all know from this, for over 50 years. In my 30 years of practice, we've used 1204 and 1205 and a different 1501. So we argued that the new proposed 1501 doesn't really properly state the status of the law. We did not agree that somehow, just because it's a new IPI, that it represents the law without any type of judicial oversight like we have today. And Judge Brosnahan used her discretion and decided to accept the jury instruction because it was the new IPI. She rejected our attempts to modify the new one by putting in sole proximate cause language. We tendered that. And she rejected our 1204 and 1205, stating that the Supreme Court had withdrawn or revoked them. I can't remember the exact word she used. But, again, we think, in due respect, she was incorrect on that, the Supreme Court. And that was one of the questions. Did she actually say that they'd been withdrawn or rejected by the Supreme Court? By the Supreme Court. And, you know, I don't want to fight with Judge Brosnahan on that. So we just politely disagreed. And so we weren't permitted to utilize 1204 and 1205. Now, in this particular case with the facts, I wasn't going to use 1204 because we were not blaming any otherbody's conduct. So this is really just a 12.05 case, something else as the cause. So our position here today, and it's my understanding, again, I'm not the appellate mastermind. I agree. Mr. Griffin is. But from reading the law, it sounds like this is a de novo situation for you under the Bailey case. And I think worst case scenario, it's an abuse of discretion. I'm comfortable defending our position under either standard. But I think it's a de novo. And I think it's a huge responsibility for you three. This is going to be the seminal case that's going to decide personal injury cases in the state of Illinois, especially mental health cases, for years to come. And we have to do it because for the last year or two, on all of these cases, including my own trials, we get the new and, quote, improved 1501. And the judges are saying, well, I'm sorry, Mr. Ault, this is the new IPA. I got to follow it. And then they reject our 1204 and 1205. They reject our attempts to modify the new modified 1501. And so we're stuck with it. And we're stuck with a version of the law that we feel deeply is not supported by our case law, which is ample. And I'm not going to go through every single case. I mean, you all read this. But it is not hyperbole. It's not hyperbole that our position has been the state of the law for over 50 years. And so now that you can interrupt me any time you want. Yeah, I hate to interrupt. No, I invite questions. It's okay. The instruction that was given. The new one. Exactly. I wish I had it in front of me. I have it right here. Can you read the last paragraph of it? Of course. Yeah, I mean, just for me. No, I'm happy to. Okay. Because I do want to talk about it. So this would be great.  I'll ask my question. Then you can read it. No, I'm going to answer your question. Then I'll go about it. With your permission. Okay. All right. So how did I distribute the whole thing? Is that okay? That's fine. When I use the expression. Mr. Griffin, you see I'm giving him a lot of leeway. He's a trial lawyer. I have seen Mr. Griffin. And I have seen Mr. Ratzak before. And I'm enjoying your presentation. But it's taking your time to get to the issues that I wanted you to. So you're allowed to now go on. I'm a slow builder. I know. Just like in my closing. This is where the rubber meets the pavement. Okay. Fair enough? All right. Yes, sir. When I use the expression approximate cause, I mean a cause that in the natural or ordinary course of events produced the plaintiff's injury. It need not be the only cause or the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury. So it talks a lot about the concurrent type thing. That obviously is an issue. Next paragraph. If you decide that the defendant was negligent and that their negligence was approximate cause of the injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury. However, if you decide that the defendant's conduct was not a proximate cause of the plaintiff's injury, then your verdict should be for the defendant. So that's the new one that was submitted over objection and the jury heard. And that's the instruction that plaintiff's counsel highlighted in the first five minutes of this closing argument, and unfortunately deleted the last sentence that talked about the defendants can actually have a defense to it. So all the jury hears in this closing is, hey, it doesn't matter if you heard about some other prior thing, something else. It just doesn't matter. That's what this instruction says. Again, I'm not a specialist in the law, but I do believe the law is fair. Maybe I'm naive. I think the law is fair. And why? Because it's balanced. And the cases we cited in our brief illustrate what I'm trying to say on this fundamentally important thing. Our cases are decided on negligence and proximate cause, so it's hugely important. The courts know this. The Supreme Court, in its wisdom, especially in the Leonardi case, go out of their way to talk about this concept of balance. The concurrent language in this 1501, even the original one, is very plaintiff's friendly. It just is. So the courts in all the cases we've cited to you, Ellington and the rest, stand to the proposition that it's unfair for plaintiffs just to give that concurrent language without anchoring. Even Mr. Ratzak puts that phrase in his brief, this concept of instructional anchoring. I agree with it. He's spot on. You have to have that anchoring. You have to have the balance. And the sole proximate cause provided that balance. And what I think is so important is how can this committee, and, hey, I believe these committees do a good job. Even if you, Your Honor, weren't part of it, I think they do a good job. I did the criminal. Okay. All right. I think all of them do. Everybody's doing their best. But here's the thing. I've done this 40 years. The number of significant IPI changes, how we try and red-map these, I can count them on a hand in 40 years. This is our bedrock for 50 years. I just don't understand how this committee decided to upend it all. They're not an elected body. They're not supposed to be creating new law. They're supposed to be writing IPI instructions and sometimes revising them to have them reflect the law. I accept that. If there had been a big change in the courts, if the Supreme Court said, hey, you know, I think this 1204 and 1205, we've lived with it for 50 years. But now, as the Supreme Court or an appellate court, we say, you know, I think we've been wrong for 50 years. It's confusing. Like the IPI, they say in their notes, they think that it's causing confusion and consternation. That's the quote. So you ask your honor, how did the IPI justify what they did? You know, I've read their notes. They've got three pages and only one paragraph addresses it. And in that one paragraph, they talk about, well, we think this causes confusion and consternation, so we wanted to combine. That's what the stated reason is. Okay. And they said, we've combined the old 1501, 1204, and 1205. So now I look at the new one that I just read into the record. Does this, in good faith, reflect combining these instructions? It continues to talk about the concurrent part of this two times now in this instruction. And where is the anchoring instruction to provide the balance that multiple appellate courts and multiple Supreme Courts have said are important and required? It's been deleted. Counsel, I'm going to interrupt you for a moment, please. Assuming, for the sake of our discussion, that the tendered instructions were inadequate, tell me, tell us, why you believe that without that instruction, the jury would have found differently, what prejudice resulted as a result of them. In other words, lacking this instruction, the jury would have, or just for that, tendering that so proximate cause instruction, the jury would have found differently. And that's a fair question, Your Honor. Again, it goes to the heart of my defense. And I even start by closing by telling the jury, follow the law. It's your road map to get to your just verdict. And I'm quoting the law throughout my closing, but I no longer have this anchor that we've had for decades that says it's part of my defense theory, not that just my doctors complied with the standard of care, not just that we don't think our folks caused this injury, but, Your Honor, these juries appropriately crave an alternative explanation, like, well, we didn't cause it because we don't think it's hypoxia. This young man has some injuries. We caused them that. That's what we do this on most of my trials. We provide an alternative fact-based narrative to explain to the jury an alternative reason why the plaintiff has their permanent injuries and why it's not caused by what we're doing. And it's all in the construct of a sole proximate cause. And so I spent weeks trying to point and educate the jury that this is all because this baby had dramatic interruption of normal fetal development, and that caused all these problems. And that's the sole reason. But I don't have, then, the instruction. I can show the jury in the clinic I have done for 30 years where I can say, because this child didn't develop properly in those seven weeks, it has nothing to do with whether the baby's delivered an hour earlier. And here I've got a sole proximate cause instruction that is anchored to where it says it's not a defense if there's something else that caused this, if you think the defendants were negligent in a proximate cause. But then it gives the big but. But if you think the sole proximate cause is something else, other than the conduct of these defendants, and here that's the FGR, then your verdict has to be for the defendants. So the way they revised it and took out the sole proximate cause, it just took out my main theory of the defendants. All I can just say is, well, my defendants, we don't think caused this. And so for Leonardi, and he was just bumped on, Your Honor, and you've been very, very generous with me, very generous. But unfortunately, you can see I try a lot of passion on this type of stuff. But I just think the key to this whole thing is Leonardi, and I know you all know it better than I do. But, again, if I can just say this into the record, Your Honor, you know, and this is the Supreme Court, for heaven's sakes. A defendant has the right not only to rebut evidence tending to show that the defendant's acts are negligent and the proximate cause of claimed injuries. That part right there, that's what 1501 in the revised version says. Yes, we have a right to say we don't think the defendant caused this. That's the last line we read in the new 1501, with no mention of sole proximate cause. So Leonardi says we have a right to do that, and that's the first sentence. But it says, but also, also, we have the right. The Supreme Court has given us another right to endeavor to establish by competent evidence that the conduct of a third person or some other causative factor, the FGR, is the sole proximate cause of plaintiff's injuries. And then they go further. Further, if the evidence is sufficient, the defendant is entitled to an instruction on this theory. The sole proximate cause of this theory. This committee has turned this all on its head. I have no idea why they did. I have no comments about their motives. I don't know. I'm not going to speculate. But this could not be any more clear with the Supreme Court. And, you know, I would love to have the committee come here, and we can ask them, why did you do this? And the first question I would ask is, where's been the change in the law of 50 years that you're now going to disregard it all, turn it on its head? There isn't. The decision today, in due respect to you folks, it's going to be the new litmus test, because we don't have any law currently supporting that new version. We don't have any law that says, you know, we were wrong the last 50 years. So if you have any questions, I'm happy to answer them. I apologize for being so long-winded. I'm a trial lawyer. I'm not an appellate guy. I've been accused of the same thing as a trial lawyer. I have too much passion. I apologize. I have just a couple of questions. The judicial admissions, you've actually addressed that. Well, I hope I did. You did, and I just looked back on my notes and thought about it. The high-low offer, what's it with? Sure. I mean, it depends. I'm not trying to be a legal pew. We put it on the record. So we have a transcript. To me, that's right. And we also have, I think, a follow-up e-mail or text. So, yes, we have sufficient written basis for it. But you believe there's an e-mail or text to that? I believe so. I think it's referred to it. Exactly. Okay. But I know for sure it's confirmed in the written record. I read it in the transcript. I was wondering if there was something other than what was read in the transcript. The transcript says there was an offer. The other side said my client denied it. Right. But I just didn't know if there was anything earlier. And with your permission, Your Honor, because I do get a little worked up here, I think I needed to more clearly respond to your important question about the judicial admission. I mean, I talked a lot about how I continually denied it. I would just say you don't have to. I am going to go back and read the record. But I forgot one important point. Okay. It was taken out of context. You kind of asked about that. And I've got the context right here. That's what I wanted to hear, the context. Yes. So can I just read this record? Yes, absolutely. Hopefully sit down and let's hear more questions. Yes. All right. So I just started off with the cautionary 101. And I said your verdict can't be based on speculation, prejudice, sympathy. Right. So then I say here. And I said I think these are the most important words in the instructions. I said can you imagine a system where you don't have this warning about using prejudice, speculation, sympathy. I said seriously, can you imagine that? Can you imagine a verdict being based on guesswork? And now I'm acting like I'm that theoretical jury that's doing what it's not supposed to do. Well, I don't know what happened to AJ. I don't know what the communications were in this case. I'm in their shoes now. What could we possibly know seven and a half years ago? We have conflicting information. We have conflicting experts saying how, when, and why he suffered these permanent injuries, these permanent deficits. And say I don't know. I can't make heads or tails. I'm talking about how a juror would look at this. Then I say let's go for AJ. It's not me talking. I'm saying so let's go for AJ. Let's give him, I don't know. I don't think I had in the numbers, but it's like over 60 million. Then I say I'm still acting like I'm one of these theoretical jurors not following the rules. Well, you know, maybe we did something wrong. Maybe we caused this amount. Maybe we contribute to it in a fraction of way. But I say the system is wise. The system says please do your duty and do not base your verdict on speculation, which is the cornerstone, I submit, the plaintiff's case. He took one or two sentences out of that to somehow suggest I'm saying I'm admitting liability. I was just trying to tell the jury please don't do this because I understand this is the way jurors often think. That's all it was. And then to negate an hour and a half of closing where I go on and on and on defending the case vigorously on standard of care, causation, et cetera, that's why I think that whole argument was not in any way factually based. All right. Judge, did you have another question?  Thank you, counsel, and you will have an opportunity for rebuttal. All right, but I appreciate the court's indulgence. It was a pleasure. Thank you. And Mr. Rasek, of course, you can take as much time as you want as well. You're not as long-winded as me. I have to agree with you there. He gets to the point. I know. Thank you. He and Mr. Griffin are a little quicker. Okay. But let's do it for the next time we just fell on it. Okay. Flip it a little. All right. Go on, Mr. Rasek. Thank you. Good morning. Thank you for your patience. Good morning, Your Honors. As I said, Michael Rasek, I'm here on behalf of the plaintiff appellant. I will, in fact, hopefully be much briefer. I want to start, I think, with the court's question about the difference between the two instructions and what was said in the jury instruction conference. The arguments, the detailed argument that this court heard today in the jury instruction conference by the defense about why their instruction was better and, in fact, had to be given rather than the new instruction, is not what the trial court heard at all. I put it in our appendix on purpose because context matters there, too. It's in the appendix. The court can see it if it hasn't already. It was the most perfunctory exchange imaginable. We tendered 1505 or 1501. They tendered their version of 1501. The court at one point specifically says, I don't know exactly what the defense is suggesting here. The court practically asked them, why should I be giving a withdrawn IPI instruction, which that might result in error because some courts have said if it's not IPI, you shouldn't use it. And what's wrong with the one that plaintiff's tendered and why is yours better? That question, there's like a page and a half. That question was never answered by the defendants. They just basically said it's better. And it's not better. And the difference is, as counsel read earlier, the difference in the two 1501 instructions is the last line. In one, it says our version, the defendant's conduct was not approximate cause, and you should find for the defendant. In another, it said if you decide that the sole approximate cause of the injury was something else or the conduct of someone else, then your verdict should be for the defendants. Putting myself in the shoes of a juror, something I can do here, something they could not do in their closing argument is put themselves in the position of a juror, and I'll get to that when I get to the admission. Putting yourself in the position of a juror, and you hear these two phrases, if you find that the conduct was not approximate cause, you should find for the defendant. If you decide that the sole cause was something else, your verdict should be defendant. If it's the sole approximate cause, I think it follows it's not your fault. And there is a problem with the instruction that they proposed. It's because it has the word sole in it. And that wasn't discussed here, but it was discussed at length in the briefs. Two courts have said sole is confusing because they have multiple causes. And you can't have sole if you have multiple causes. And their defense... Let me just stop you, Mr. Resnick. Aren't there a lot? I'm sorry? I've read a lot of cases that have said aren't there a lot of cases that say you can say sole when there's 10, 12 different possible people who could have individually or together combined to be the sole proxy. I would disagree with that. There may be cases out there where if you read the whole case, it turns out there was more than one alternative cause argued, but it was never made an issue. When it was made an issue, the defense lost because Clayton and Abruzzo both said sole means one. And the dissent in Douglas said sole means one. I think there was a case after Abruzzo that disavowed Abruzzo. That was Douglas. That was Douglas. But there was Clayton a long time ago. Isn't that in the committee comments? Douglas is in the committee comments, precisely. I remember Clayton because it was my case a long, long time ago, a very long time ago. Abruzzo said the same thing. Douglas came along. Two of the judges said sole can mean many. And the dissent said, how does sole mean many? The Douglas majority said, well, you can have situations where multiple things actually act as a unit, like a troop of soldiers. So it's individually. That's right. In this one, you can't have that because there are various. When you're referring to it as a unit, you're referring to the unit itself as a whole acting, not the individual. If you're talking individuals, you would have said individuals. When you're looking at a unit, you're talking about a unit. The alternative causes here are not a unit. The alternative causes are discretely separate possible causes of AGs, permanent injuries. The other thing that was wrong with Douglas is Douglas could have said, and it's very difficult to, the logic just goes, it's transitive. Douglas said Abruzzo was wrong because Abruzzo thought that Leonardo, I'm sorry, Douglas thought that Abruzzo was wrong because Abruzzo held that the defense could not argue the theory of sole proximate cause. That's not what the appellate court in Abruzzo said. They just said you can't get a sole proximate cause instruction unless you have sole at one. You can argue all you want. Was Abruzzo this appellate? Was Douglas this supreme or not? No, no. All three are appellate court decisions. Okay. The Supreme Court has never addressed this to my knowledge. Maybe they will soon. It may be the case that it may be the vehicle. It may be what the defense is looking for here. I don't know. But going back to Douglas, Douglas' basis was simply wrong when it said Abruzzo said you couldn't argue the theory. You can argue the theory. And, in fact, the trial court here, and this may get to Justice Martin's question, the trial court here, you can argue sole cause all you want to the jury. But they didn't. I searched just to make sure. I did a word search again. You'll not see the word sole cause. Sole does not pop up in their closing argument. And I can explain why. I think I said it in the brief. If I stood in front of a jury and said, I approve there's a sole approximate cause, and you list three things that are causes, and the three things were what counsel put on the board in closing argument, he called these, this is from, I'm sorry, in the testimony. He had Dr. Davis look at a board. It's at page 3524, I think. Causes of permanent injury. FGR, fetal growth restriction, microcephaly. He said not HIE, but that goes back and forth in genetics. It's very clear that Dr. Davis said there's multiple causes. Dr. Sims blamed it on FGR and microcephaly at 21, I think, 81 and 82, if I'm right. He couldn't stand in front of the jury and use sole, and that's why the instruction was good. I thought he, well, how could he use the word sole in the argument if the judge didn't allow him to have it in there? No, no. The judge did not tell him. I'm sorry. The judge did not say he could not use the word sole. No, I said how could he use the word sole in the argument if there would not be a concurrent jury instruction that allowed him to use that word? Because he was allowed to do it, and you can make an argument if the words are not in the jury instruction. You're not constrained by it. In this situation, he could have said the only, but he couldn't. The question is he couldn't do it. Even if he had the instruction, he can't make a logical, counsel cannot make a logical argument about sole for the reasons that the other courts have held. It's not sole. They listed three causes. He would have looked inconsistent in front of the jury, with the instruction or without the instruction. Going back to, your Honor asked, the cases that the committee looked at, they cited Douglas. And Leonardo. And Leonardo. Leonardo, the counsel read Leonardo to you. It said if it, Leonardo was basically a question about whether or not you can use that argument. And the Court said you can use that argument. The Court there had barred any evidence of other causes. The Court here didn't, not only did not bar any evidence of other causes, the record is replete. That's all that was in on the defense side were other causes. On the cross-examinations, counsel for the defendant was plaintiff's expert, raised other potential causes. It was replete with them. Leonardo just said you can do that. You don't have to plead sole proximate cause. It's really the gist of Leonardo, because it's not an affirmative defense. It's just another way of saying, and this is the critical point, it's just another way of saying that the plaintiff did not prove their case. The Supreme Court said the defendant is entitled to that instruction, and I submit to the Court that the instruction that was given in this case follows that. If you decide that the defendant's conduct was not a proximate cause, it doesn't say because somebody else was the cause. It's not in there. I understand what I'm walking into. Right. That's their point now.  They didn't ask to have that put in there. They submitted, if we look at the jury, if we look at the, that's my point. When we look at the jury instruction conference, they don't give the Court the explanation that you just received today. They didn't give the explanation we did. We didn't make much of an argument there because the Court sided with us, but we would have. But if counsel on the other side had offered or explained why they wanted this language, it would have given us, the plaintiff, the opportunity to talk about it. For all we know, we may have come up with something different. But it was perfunctory, and they gave the trial court nothing to rely upon. And the cases all say, if you have an objection to something, it's got to be specific. I've got to put the judge on notice. I can't just say, I don't like it, which is pretty much what they did. Can I ask a question? They could have argued that in your honor. Did the plaintiff, when they submitted him and the other side objected, say that 1204 and 1205 had been withdrawn? Yes. I think the Court said that, I believe, before you. Yeah, I know the Court said that. I don't know. I'm not sure. Okay. Yeah, I'm not even sure that we, I don't know that we got that opportunity. The Court, I think, said they withdrew him. And at that point, there should have been the explanation that we heard today. I can't get into this explanation about, we heard it, the plaintiff's borrowed a royal maturity instruction. To me, that's not a fair argument. I can't do anything with that. It's not a proper one. If they had juried and made that to the trial court, I can guarantee that. I'm pausing because I wanted to go back. Just going back to the point that I made, the difference between the last sentences of the old 1501 and the new 1501, I believe, are not, in a layman's mind, significant. Lawyers think these words mean so much. But the question here was the jury misled. Would the outcome have been any different if they said, if they were told if the defendant's conduct was not approximate cause, the defendant wins? If the defendant's conduct was, if you decide something else was sole approximate cause, the defendants win. The point is, we're never going to accept the second argument because counsel never argued sole approximate cause. And Young said, how could he use sole? Why would he not use sole? Nobody said he could not argue sole approximate cause. The judge never said that. The fact that he didn't use sole approximate cause in that closing argument is because he couldn't. He couldn't keep a straight face. It wouldn't work. I don't know. I'm not sure how an opinion can be written that equates those two. I want to make sure I try to address your other comments. Ginsburg, did you receive a written high and low argument? It was a, to the best of my knowledge, there was a text. There was a text. Frankly, I don't think I was even aware of it until I saw the defense brief. But I believe there's a site in the record to a text. It's a very brief, like you would see a text. And is there a response in the text saying, no, my client did not accept? I don't think so. I don't believe so. See, I have to look. I don't think there was a disagreement in the brief. If I have it right, the text says the defense lawyer was on his way to an airplane, and your clients will have to say yes or no in court. Even assuming it wasn't writing, if I can just go there for a second, it wasn't an offer because it did take into account all possibilities. It's a defective offer. It's like a contract. It doesn't have the dollars in it or the data performance. It did say, it did say what would happen if a jury, if the jury couldn't reach a verdict that doesn't say what would happen. That's not a good high low. A proper high low takes care of all eventualities and settles the case. This case doesn't even settle the case at the end when it goes to the jury because there's loopholes. And it surely doesn't settle the case when the offer is made, which is what the whole legislative history says, is we don't want to have these cases going to trial. We want to have them settled. And there wasn't an offer. It settled it because it was going to make some sort of trial. So let me ask you this, counsel. Excuse me. The, do you agree or disagree that the text would be a proper written offer as a statute? I say no. I'm an advocate. I mean, but I always say no because when the legislature was looking at this, I read the legislative history and say there should be an offer out there, an offer that closes out the case. A written offer. They wanted a written offer so there's no dispute about what happened. A five or seven word text that said how about this. You could construe it one way. You could construe it another way. I don't believe that's qualified as a written offer. But if it is, it's still not sufficient because it doesn't close the case out. As to the admission, because Your Honor, Justice Lampkin asked about that. I wasn't suggesting that counsel did anything wrong. That's what they call my analysis absurd. There's some pejorative word. I could see what was happening on that page. They were talking, as he read through, they were talking about damages. They were, counsel was addressing a jury in a situation where all the standard of care evidence was against them. Everybody pointed the finger at their nurses and residents. And he was going to lose the case and he tried to keep damages down and he did. He said, because he said, counsel said I was putting myself into the shoes of a juror when I made that argument. That's not in the post-trial motion. That's an argument that came up this morning. I haven't had a chance to address that because I first heard it here for the first time. It's not a bad argument if he was in front of a jury, but he can't do that in front of a jury. You can't put yourself in the shoes of a juror. And counsel knows that. Just as he said, he's had trials for 40 years. He said we did something wrong. Maybe we caused it. Maybe we contributed in a fraction of a way. That could truly be read to me. We're just a little bit at fault. So don't blame us for everything that happened. He had lots of other things wrong with him, too. Don't blame him for the other multiple causes that I just argued to you about. It would be what he was saying. I thought it was a good strategy. It worked. We got, in this case, this amount of damages for a child in this situation, not only way less than what we asked for, it's just way less than what is usually the case. I hope I've addressed Your Honor's questions and your comment. There was a – I asked in terms of the defense instruction, what was wrong with adding that last sentence? The last sentence? Yes. One, it included something that they didn't ask for. That something else or some other person wasn't an issue here. That's confusing. And the other issue was Saul himself is, in fact, confusing because of what Kling and Abruzzo and the dissent in Douglas. So that's three, six, seven judges on one side, two on the other, and the two on the one side in Douglas. The reason they gave was that they read Abruzzo wrong. So I count that as a win for the plaintiff. That's why that instruction was wrong. If it wasn't wrong, did it change the outcome? That's the ultimate line. Counsel used the magic word here, I thought, discretion. With what the judge had before, with what the defense offered them, that judge had to make an instant decision. Not done. We didn't have an hour of argument. And she went with an instruction that on its face appears to let the jury, let the defense counsel argue whatever it want and told them they could argue whatever they want. She didn't stop them. She was not going to stop them from arguing Saul Parksman Clause. Unless any of you have further questions.  Oh, sorry. Judge. Thank you. Okay. Thank you. Mr. Hall. Good news. I think I can do this quickly. Number one. Excuse me. Can I get a water? Absolutely. I get seasonal allergies. I apologize. So on this issue briefly of the high-low, we did look for, we cited that text as an exhibit in our briefs and we were actually able to find the text. And it was from me to Mr. Bonemark, the lead trial attorney. And it just simply said we're up in our high-low from 5 low to 20 high to 6 low to 20 high. And it wasn't any more expansive than that. But it was in writing. And it was by me to lead trial attorney. And did you get a response back or was it just a response that Mr. Bonemark said in court? I was about to. My response in the record was fly safe. I was going flying. So he just acknowledged that he got it and told me to fly safe. And that was it in writing. Okay. And then just to follow on that a little bit, I think it's pretty clear it's a settlement agreement, a high-low. I mean, there's consideration involved. So I committed to my client that if they accepted it, we're going to pay money no matter what. That's consideration. And we're not going to do an appeal. The high-low is we don't have an appeal. That's the whole idea. So we're giving up the right to appeal. We're going to pay money no matter what. And then we just need the jury to tell us how much it's going to be. But that's a valid settlement agreement. And so I think that the high should apply. But, again, we're slowly getting me over my ski tips. I'd like to rely on our briefs. And Mr. Griffin, I think, has greater expertise on that than I do. And I think they eloquently put it in our brief. But just to get back on the instructions, again, I was part of that. So the law, and we cited it. Let me just say, don't repeat, because we are. I just want to say, Mr. Ratzak suggested that we needed to put all the bases on the record that we're doing today at the time with Judge Brosnan. We cited Brunton, which says the exact opposite. So we do not have to put all of our appellate arguments at the time when we object to her refusing to give 1204, 1205 in our version of 1501. So I just want to say, Mr. Ratzak didn't support his point with law. We support ours with law. And you had asked, Your Honor, about the IPI Committee when they had this revision. You know, they cite just two cases on this change. Douglas and Leonardi, of all things. But Leonardi, they only cite it to say that sole proximate cause is not an affirmed offense. That's the only reason they cite Leonardi. And they ignored the sum or portion of it that I read into the record. And nor do they cite that the courts think there's any confusion or consternation. This is just the committee thinks there's confusion and consternation after 50, 60 years. So they cited no law, so vote what they did. And then to finish the lesson, because this directly involved me, on the sole proximate cause and the evidence. So, again, the law, Douglas, I think, supports our position. They talked about multiple related things constituting sole proximate cause, just like the court had referenced. So Douglas actually supports our position. But, Your Honor, under our facts, I don't even need to go there. I had one argument for why this child's injuries were unrelated to our care and why delivering the baby an hour earlier wouldn't have made a difference. And it's FGR, fetal growth restriction. The baby didn't develop properly. And that was an agreed upon fact. What might be confusing is we also talked a little bit about microcephaly, which is a smaller head. But that's part of fetal growth restriction. The baby didn't grow properly. The baby was... The brain didn't get bigger in the head, so the head... Right, but that's all part of... The baby didn't develop properly. So microcephaly's part of this. And then counsel in the brief say, well, you know, they talk about, well, why didn't we have FGR? Placental insufficiency, infection, or genetics. It doesn't matter. My experts all said it doesn't matter and we don't know why the baby didn't develop right. There's three possible reasons, but we don't know it. The causative thing is the baby didn't grow right, regardless of what was the trigger for that phenomena. And then the brain didn't develop right. And that's why this child has the problem. So we provided one explanation for the jury, one and only one, as to why this baby's permanent injuries are unrelated to our care, because it was the last several weeks of development where the baby just didn't grow right for whatever reason. That was the only reason. And that is a so proximal cause. And, again, I'm the one who had to make the strategic decision. I was unable to get the instruction that we thought we were supposed to have. And I'm not going to argue something contrary to the instructions. So you can look at all my other closings. I talk to SOLE all the time because it's in the law. And if I start talking about SOLE, SOLE, when Mr. Bonamart stands up and rebuttal, he can say, Mr. Hall's talking all about this SOLE, SOLE, SOLE. Where is it in the instruction? It's not. He's misstating it. And I didn't want to set myself up for that attack and rebuttal. I tried to follow the law of the case as provided by the trial judge. So I'm hoping this is broad and brief. Are there any questions? But I don't believe I have any. We're okay? No questions. Thank you. Again, it was really nice meeting everybody. And thank you for letting me come into your home. This is new for me. All right. It's wonderful to see all these students here. I have to say that I hope that you enjoyed this. You don't know. I see the heads shaking. Yes. Yes. You don't know. This is my first time meeting Mr. Hall. I know Mr. Griffin and Mr. Razzak very well. I don't know the young lady was with Mr. Razzak. I sat counsel at the table with him. I do know that we have excellent lawyers on both sides. So I hope that you enjoyed and were informed. I think the briefs were excellent. We're going to search the record. And I won't say shortly, but we will have a decision in due course.